**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **RAYDENE E.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **No. 19 C 3125** |
| | ) |
| **KILOLO KIJAKAZI,** | )   **Magistrate Judge Finnegan** |
| **Acting Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## ORDER

Plaintiff Raydene E. seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("SSA"). (Doc. 1). The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and the case ultimately was reassigned to this Court. (Docs. 5, 6, 9). Plaintiff filed a motion for summary judgment arguing that the case should be remanded, and the Commissioner filed a motion for summary judgment arguing that the decision should be affirmed. (Docs. 17, 18, 27). After careful review of the record and the parties' respective arguments, the Court affirms the Commissioner's decision.

## BACKGROUND

Plaintiff applied for DIB on August 28, 2015, alleging disability since August 19, 2015 due to a stroke, speech and focus problems resulting from the stroke, balance issues, bilateral carpal tunnel syndrome, allergic asthma, blood pressure problems, memory difficulties, allergies, sleep apnea, hypertension, acid reflux, vitamin B12 deficiency, obesity, dizziness, thinning hair, and high cholesterol. (R. 25, 244-50, 302,

315-16, 379, 401).[1]  Born in March 1964, Plaintiff was 51 years old at the time of the alleged onset date (R. 37, 244, 302, 379, 401), making her a person closely approaching advanced age (age 50-54).  20 C.F.R. § 404.1563(d).  Her date last insured was December 31, 2019.  (R. 28, 302, 379, 401).  Plaintiff has a graduate degree in social work and last worked as a case manager for the Department of Veterans Affairs ("VA") from December 28, 2003 to August 11, 2015, when she stopped working because of her conditions.  (R. 60-61, 85, 97, 305, 315-17, 329-30, 371-78).

The Social Security Administration denied Plaintiff's application initially on November 9, 2015 and on reconsideration on June 1, 2016.  (R. 25, 109, 127, 147-50, 154-63).  Plaintiff then requested a hearing, which was later held before Administrative Law Judge ("ALJ") Kathleen Kadlec, where Plaintiff was represented by counsel.  (R. 25, 45-108, 164-66).  Plaintiff, her sister, and Vocational Expert ("VE") Abbe May testified at the hearing.  (R. 25, 59-106).

The ALJ denied Plaintiff's claim in a decision dated April 25, 2018.  (R. 25-39).  The ALJ found that Plaintiff's "status post cerebellar vascular accident ('CVA'), hypertensive vascular disease, obesity, affective disorder, and anxiety" are severe impairments, but they do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 28-31).[2]  The ALJ concluded that Plaintiff retains the residual functional capacity ("RFC") to perform light work with the following limitations:

---

[1]     While the DIB application states that Plaintiff became unable to work on August 31, 2014 (R. 244), field office reports consistently reflect an alleged onset date of August 19, 2015.  (R. 302, 379, 401).  The record also includes an application for Supplemental Security Income ("SSI") under Title XVI of the SSA dated September 4, 2015.  (R. 251-55). The ALJ did not mention this SSI application, and neither do the parties.

[2]     "Cerebrovascular accident (CVA) is the medical term for a stroke." https://www.healthline.com/health/cerebrovascular-accident, last visited November 12, 2021.

frequently operating foot controls bilaterally; occasionally climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; occasionally balancing, stooping, kneeling, crouching, and crawling; never working at unprotected heights or near moving mechanical parts; never operating a commercial motor vehicle; performing simple, routine, and repetitive tasks; making simple work-related decisions; occasionally interacting with coworkers and supervisors; and never having public contact. (R. 31).[3] The ALJ accepted the VE's testimony that a person with Plaintiff's background and RFC could perform jobs that existed in significant numbers in the national economy, namely Laundry Worker, Mailroom Clerk, and Produce Sorter. (R. 37-38, 97-100). As a result, the ALJ found that Plaintiff was not disabled from the August 19, 2015 alleged onset date through the date of the decision. (R. 26, 38-39).

The Appeals Council denied Plaintiff's request for review on March 5, 2019 (R. 1-6), rendering the ALJ's April 25, 2018 decision the final decision of the Commissioner reviewable by this Court. *Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012). In support of her request for remand, Plaintiff argues that the ALJ erred in: (1) determining that Plaintiff retains the mental RFC to perform simple, routine, and repetitive tasks and make simple work-related decisions despite her moderate limitation in concentration, persistence, or pace and difficulties with changes in routine and stress; (2) determining that Plaintiff retains the physical RFC to stand or walk for about six hours in an eight-hour workday despite her balance problems, knee pain, and fatigue; (3) failing to address

---

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds . . . a job is in this category when it requires a good deal of walking or standing . . . ." 20 C.F.R. § 404.1567(b). A job in this category requires walking or standing "off and on, for a total of approximately six hours of an eight-hour workday[.]" *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).

treatment records of treating neurologist Traci Purath, M.D. from October 2014 to May 2015 limiting her to working part-time as a case manager for the VA prior to the August 19, 2015 alleged onset date; and (4) assessing the subjective symptom allegations. For reasons discussed below, the Court finds that the ALJ's decision is supported by substantial evidence.

## DISCUSSION

### I.   Governing Standards

####    A.   Standard of Review

Judicial review of the Commissioner's final decision is authorized by 42 U.S.C. § 405(g) of the SSA. In reviewing this decision, the court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the applicable regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "'displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations.'" *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011)).

In making its determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). The ALJ need not, however, "'provide a complete

written evaluation of every piece of testimony and evidence.'" *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and quotation marks omitted)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

### B. Five-Step Inquiry

To recover disability benefits under the SSA, a claimant must establish that he is disabled within the meaning of the SSA. *Snedden v. Colvin*, No. 14 C 9038, 2016 WL 792301, at *6 (N.D. Ill. Feb. 29, 2016). A claimant is disabled if he is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, an ALJ must conduct a standard five-step inquiry, which involves analyzing: "(1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citing 20 C.F.R. § 404.1520). If the claimant meets his burden of proof at steps one through four, the burden shifts to the Commissioner at step five. *Moore v. Astrue*, 851 F. Supp. 2d 1131, 1139-40 (N.D. Ill. 2012).

5

## II.  Analysis

### A.  Mental RFC

Plaintiff argues that the case must be remanded because the ALJ erred in determining that she retains the RFC to perform simple, routine, and repetitive tasks and make simple work-related decisions.  (R. 31).  A claimant's RFC is the maximum work that she can perform despite any limitations.  *See* 20 C.F.R. § 404.1545(a)(1); SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996).  "Although the responsibility for the RFC assessment belongs to the ALJ, not a physician, an ALJ cannot construct his own RFC finding without a proper medical ground and must explain how he has reached his conclusions."  *Amey v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *13 (N.D. Ill. Feb. 2, 2012).

Plaintiff first objects that the limitation to performing simple, routine, and repetitive tasks in the RFC and corresponding hypothetical question to the VE failed to account for her moderate limitation in concentration, persistence, or pace.  (Doc. 18, at 14-15; Doc. 28, at 6-7).  "As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record."  *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014) (citations omitted).  "Among the mental limitations that the VE must consider are deficiencies of concentration, persistence, or pace."  *Varga v. Colvin*, 794 F.3d 809, 813-14 (7th Cir. 2015) (citations omitted).  "But an ALJ need not use any 'magic words' in an RFC assessment . . . so long as the assessment 'incorporate[s] all of the claimant's limitations supported by the medical record.'"  *Weber v. Kijakazi*, No. 20-2990, 2021 WL 3671235, at *5 (7th Cir. 2021) (quoting *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019) (internal citations omitted)).

"And there is no categorical rule that an ALJ may never accommodate 'moderate' limitations in concentration, persistence, and pace with only a restriction to simple tasks." *Id.* (citing *Lothridge v. Saul*, 984 F.3d 1227, 1234 (7th Cir. 2021)).

Here, the ALJ found that Plaintiff has a moderate limitation as to concentration, persistence, or pace and expressly considered this limitation in assessing the RFC restricting Plaintiff to simple, routine, and repetitive tasks and simple-work related decisions. (R. 30). In particular, the ALJ accorded "[s]ignificant weight" to the opinions rendered by state agency reviewing physicians Ellen Rozenfeld, Psy.D. on November 7, 2015 and Stacey Fiore, Psy.D. on May 28, 2016 that "[o]verall, from a psychological perspective," Plaintiff "retains the ability to perform simple, repetitive tasks on a sustained basis" in a setting with routine changes. (R. 36, 124, 143). Drs. Rozenfeld and Fiore found that Plaintiff was moderately limited in terms of concentration, persistence, or pace (R. 118, 137), and both doctors explained that, while her "ability to carry out tasks with adequate persistence and pace would be moderately impaired for detailed/complex tasks," she retained the ability to adequately complete "routine, repetitive tasks." (R. 124, 143). They continued that, "[w]hile ongoing symptoms may reduce efficiency and stress tolerance, this is not to the degree as to prevent ability to engage in work activity within an average schedule and work week the majority of the time." (*Id.*). As such, the doctors' RFC opinions and accompanying explanations support the ALJ's decision to limit Plaintiff to simple, routine, and repetitive tasks to accommodate her moderate deficiencies of concentration, persistence, or pace. *See Morrison v. Saul*, 806 Fed. Appx. 469, 471, 473- 74 (7th Cir. 2020) (finding that ALJ included restrictions related to decreased concentration, persistence, or pace where: he explained that plaintiff's moderate

difficulties in this area supported limitation to simple and detailed, one-to-five step instructions based on medical expert and consulting psychologists' opinions; and drew restriction from medical expert's opinion, "which is a permissible way of 'translating' medical evidence into work-related restrictions."); *Urbanek v. Saul*, 796 Fed. Appx. 910, 912-14 (7th Cir. 2019) (finding that ALJ adequately accounted for plaintiff's moderate limitations in concentration, persistence, or pace with restriction to simple, routine tasks where she appropriately relied on medical expert testimony, which was consistent with consulting psychologists' opinions, to formulate RFC).

The treatment records also support the ALJ's decision regarding the extent of Plaintiff's mental limitations. In August 2014 (nearly a year prior to the August 19, 2015 alleged onset date), Plaintiff had a CVA or "ischemic stroke." (R. 32, 34, 487-92, 665, 685-90). In mid September 2014, neurologist Dr. Purath noted that Plaintiff had minimal deficits and some word finding difficulty, but overall was "doing extremely well." (R. 32, 704-05). Plaintiff attended speech therapy regularly from late September 2014 to early December 2014 (R. 492-518), and, on discharge, she had met all short-term goals, demonstrated only mild word finding difficulty with the ability to self-correct, and had the functional verbal organization necessary for word retrieval and sequential organization of thoughts. (R. 34, 517). She underwent no further speech therapy or other therapy to improve her cognitive functioning. (R. 29, 30, 34).

Plaintiff continued to treat with Dr. Purath monthly from October 2014 to June 2015 (R. 706-21), during which time she returned to work as a case manager for the VA on a part-time basis. (R. 34). In late June 2015, Plaintiff had a "possible transient ischemic attack" ("TIA"). (R. 32, 34, 542-78, 592-614, 626-41). Even at that time, a psychiatric

examination showed that Plaintiff was oriented with normal affect, judgment, and insight; and a neurological examination revealed that she was attentive and cooperative with intact language and memory. (R. 34, 552, 627). A head CT was normal. (R. 32, 536, 633). An MRI of the brain revealed no acute intracranial abnormality, and an MRA of the neck showed no significant focal stenosis or occlusive disease. (R. 643-45).

On neurologic examination by primary care physician Diana David, M.D. in July 2015, Plaintiff was alert and oriented with intact speech. (R. 34, 678). When Plaintiff saw Dr. Purath in late August 2015 (shortly after the August 19, 2015 alleged onset date and one day before she applied for DIB on August 28, 2015), she complained of increased dizziness, language issues, and balance problems. (R. 722). At the next visit in late October 2015, Dr. Purath observed that Plaintiff had definite word-finding difficulty. (R. 33, 732). In December 2015, Plaintiff saw Dr. Purath again and reported two instances of being overwhelmed by excess mental stimuli, feeling off balance, and having difficulty speaking but said rest helped. (R. 734). Dr. Purath noted that stress made "things worse" and recommended that Plaintiff ask her psychiatrist for anti-anxiety medication. (*Id.*). Still, Dr. Purath observed that Plaintiff was in no acute distress, her speech was fluent, and her language was full. (R. 33-34, 735). At that time, Plaintiff also complained of increased anxiety to mental health provider Vanessa Chang, M.D., who nonetheless noted: fair insight, judgment, attention, and concentration; intact grooming; goal-directed thought processes; and intact associations. (R. 30, 34, 742-43).

Plaintiff continued to visit Drs. Chang and Purath periodically in 2016 before moving from Wisconsin to Illinois at the end of the year. (R. 736-37, 743-44, 753-58, 765, 828-30). Throughout 2016, Dr. Chang consistently noted that Plaintiff showed: fair

insight, judgment, attention, and concentration; improved anxiety and depression; intact grooming; goal-directed thought processes; and intact associations. (R. 30, 34-35, 743-44, 828-30). In February 2016, Plaintiff told Dr. Purath that retiring from work had decreased her stress and helped with her health issues, her balance was still off but improved, and her symptoms were "a bit more pronounced" when overwhelmed with too much information. (R. 736). At that time, Dr. Purath described Plaintiff's speech as "very fluent[,]" and said she looked and sounded "wonderful[.]" (R. 34, 736). In June 2016, Plaintiff told Dr. Purath that she was doing well overall. (R. 33, 753). In September 2016, Plaintiff complained to Dr. Purath of increased stress in connection with her move out of state that caused more problems with dizziness, word-finding, and "head feeling 'fuzzy'[.]" (R. 755). At that time, Dr. Purath noted slowness of speech with subtle dysarthria, word-finding issues that improved with slowed speech, and "a bit" of dizziness. (R. 33, 35, 755). In December 2016, Plaintiff reported to Dr. Purath overall doing "much better with less stress" since she had stopped working, but at times experiencing decreased ability to concentrate, word-finding problems, and balance issues. (R. 757).

Plaintiff also saw primary care physician Ushari Koganti, M.D. twice in December 2016. Early in the month, Dr. Koganti observed that Plaintiff appeared anxious. (R. 766). Later in the month, he noted that her mood and affect were normal. (R. 35, 768). In July 2017, Dr. Koganti described Plaintiff as anxious, depressed, and slowed; but he nonetheless noted that she was alert and oriented, and her speech and thought content were normal. (R. 35, 773). In August 2017, Plaintiff complained to Dr. Purath of missing words when reading and experiencing anxiety in social situations that caused her to

stutter and struggle to process information, and the doctor recommended following up with her psychiatrist.  (R. 778-82).

In August 2017, Adrian Zhubi, M.D. evaluated Plaintiff for depressed mood, panic attacks, and avoidance of social situations; diagnosed social anxiety disorder and mood disorder; and assigned a Global Assessment of Functioning ("GAF") score of 51-60.  (R. 831-57).[4]  Dr. Zhubi noted occasional stuttering, scattered attention/concentration, anxious mood, and labile/dysphoric affect; but good grooming and hygiene, goal-directed thought process within normal limits, fair judgment and insight, intact memory, intact language and fund of knowledge, and behavior within normal limits.  (R. 30, 35, 841-43). For the first time since the August 19, 2015 alleged onset date, Plaintiff attended weekly individual psychotherapy sessions from late August to early September 2017 and consistently displayed: intact attention/concentration, memory, and language; and good judgment and insight.  (R. 30, 35, 858-901).

As the ALJ explained, the foregoing medical records include a notation of Plaintiff's scattered attention in August 2017, but otherwise mostly document fair to normal attention and concentration as well as other normal mental status findings.  (R. 30, 34-35, 552, 627, 678, 735, 742-43, 768, 773, 828, 830, 842, 864-65, 880, 895).  Plaintiff addresses

---

[4]  "The GAF score is a numeric scale of 0 through 100 used to assess severity of symptoms and functional level."  *Yurt*, 758 F.3d at 853 n.2 (citing *Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* ("DSM") 32 (4th ed. text revision 2000)).  In the Fifth Edition of the DSM, published in 2013, the American Psychiatric Association "abandoned the GAF scale because of 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.'"  *Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (quoting DSM 16 (5th ed. 2013)).  "[A] GAF between 51 and 60 reflects 'Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).'"  *Jelinek v. Astrue*, 662 F.3d 805, 807 n.1 (7th Cir. 2011) (quoting DSM 34 (4th ed. text revision 2000)).  The ALJ considered this evaluation without directly addressing the GAF score.  (R. 30, 35).  Plaintiff does not challenge this aspect of the decision.

none of this evidence and relies solely on two treatment notes reflecting her reports of decreased concentration to Dr. Purath in June 2016 and Dr. Koganti in July 2017. (Doc. 18, at 15, citing R. 772; Doc. 28, at 6, citing R. 753). The ALJ not only acknowledged Plaintiff's claimed difficulty with concentration, but discussed both of these doctor visits. (R. 30, 32, 33, 35). Additionally, the ALJ specifically considered: Dr. Chang's assessment in June 2016 (the same month as the visit to Dr. Purath) that (among other normal findings) Plaintiff's attention and concentration were fair (R. 30, 34-35, 828); and Dr. Koganti's observation in July 2017 of Plaintiff's otherwise normal neurological and psychiatric findings despite presenting as anxious, depressed, and slowed. (R. 35, 773).

Plaintiff next challenges the ALJ's failure to account for her difficulties with changes in routine and stress. (Doc. 18, at 15). Plaintiff relies on her statement in a function report that she handles changes in routine "[p]oorly," has "enough trouble staying focused on what is normal[,]" and "[c]hanges in routine make [her] anxious." (R. 399). Drs. Rozenfeld and Fiore noted Plaintiff's reported difficulties with stress and changes in routine and explained that she "would do better in jobs [with a] regular set of job duties and expectations." (R. 124, 143). Dr. Rozenfeld added that Plaintiff "would have moderate limitations responding appropriate[ly] to changes." (R. 124). And Dr. Fiore concluded that Plaintiff was "able to tolerate simple changes in routine, avoid hazards, travel independently, and make/carry out simple plans." (R. 143). Both doctors opined that Plaintiff retains the ability to perform simple repetitive tasks on a sustained basis in a setting with routine changes. (R. 124, 143).

The ALJ did not include the state agency reviewing physicians' exact language about routine changes in the RFC and corresponding hypothetical to the VE, but

additionally limited Plaintiff to performing routine (as well as simple and repetitive) tasks and making simple work-related decisions. Under the circumstances of this case, this phrasing fairly accounts for Plaintiff's difficulty with stress and changes in routine consistent with the doctors' opinions. *Cf. Winsted v. Berryhill*, 923 F.3d 472, 477 (7th Cir. 2019) (explaining that, in addition to addressing moderate limitation of concentration, persistence, or pace, the hypothetical question to VE "should account for the level of stress a claimant can handle" where her "limitations are stress-related"). Notably, Plaintiff posits no particular workplace changes that would be precluded by the state agency reviewing physicians' opinions, but permitted under the ALJ's RFC formulation of her functional limitations.

Moreover, the decision further reflects the ALJ's awareness of stress as a factor in Plaintiff's mental functioning since the ALJ acknowledged problems with word-finding and stuttering, particularly when stressed. (R. 30, 32, 34, 569, 734, 753-55, 778). The ALJ considered this "in providing mental health limitations, including social interaction limitations" and, in addition to the restrictions assessed by Drs. Rozenfeld and Fiore, crafted the RFC to limit Plaintiff to: occasional interaction with coworkers and supervisors; and no public contact. (R. 34, 36). Plaintiff does not take issue with these additional functional limitations.

Viewing the record as a whole, the ALJ did not err in assessing Plaintiff's mental RFC, and the case need not be remanded for further consideration of this issue.

**B. Physical RFC**

Plaintiff argues that the case must be remanded because the ALJ erred in determining that she retains the ability to stand or walk for about six hours in an eight-

hour workday. (R. 31). Plaintiff contends that record demonstrates she cannot perform the amount of standing and walking required of light work due to balance problems, knee pain, and fatigue. (Doc. 18, at 11-12). The Court disagrees. In support of her argument, Plaintiff relies on some evidence of balance, gait, and strength abnormalities. (Doc. 18, at 11, citing R. 723, 732, 736, 753, 765-66, 772, 817-19). Plaintiff fails to acknowledge that the ALJ addressed this evidence (R. 28, 32-34), however, and ignores the bulk of the treatment records showing overall normal findings.

In evaluating Plaintiff's physical impairment, the ALJ discussed evidence from before the August 19, 2015 alleged onset date, namely: the CVA in August 2014, shortly after which Plaintiff was found to be doing extremely well; followed by the possible TIA in June 2015. (R. 32, 34, 487-92, 542-78, 592-614, 626-41, 665, 685-90, 704-05). The ALJ addressed the effects of Plaintiff's obesity. (R. 32, 34). The ALJ also considered Plaintiff's treatment with cardiologist Anthony Locutro, M.D. for hypertensive vascular disease, but noted that imaging had not revealed significant cardiovascular dysfunction. (R. 32, 820-23). Specifically, a transesophageal echocardiography (TEE) revealed normal results and "EF" (ejection fraction) of 60%. (R. 32, 580-82). Chest imaging was normal, though an electrocardiogram (ECG) was abnormal. (R. 537, 540-41).

At the time of the possible TIA in late June 2015, examinations revealed normal extremities, normal musculoskeletal range of motion, 5/5 strength, and intact sensation. (R. 32, 552, 635). In July 2015, Plaintiff reported doing well and having no "sequela" (aftereffects) from the TIA, and Dr. David noted normal gait, intact cranial nerves, no focal deficits, and normal cardiovascular function. (R. 33, 677-78). At that time, Dr. Locutro allowed Plaintiff to restart her exercise routine with her personal trainer. (R. 33, 697-701).

In late August 2015 (after the August 19, 2015 alleged onset date), Dr. Purath likewise permitted Plaintiff to engage in supervised exercise to help with weight loss, strength, and balance. (R. 722-23). In late October 2015, Dr. Purath noted that Plaintiff had slow gait without ataxia and used a cane for stability when walking, but nonetheless observed symmetric strength. (R. 33, 732-33). Prior to this visit, Dr. Purath and other providers generally had observed that Plaintiff's gait was normal or not ataxic. (R. 532, 533, 665-67, 673, 677-78, 705, 713, 717). In October 2015, sleep specialist Ajit Parekh, M.D. described Plaintiff as "unsteady on her feet." (R. 33, 817-18). Dr. David also noted a "slight gait imbalance" in October 2015, and again in January 2016, but no focal deficits and normal muscle strength. (R. 33, 819, 824). In December 2015, Dr. Purath observed that Plaintiff's gait was not ataxic, strength was symmetric, and cranial nerves were within normal limits. (R. 33, 735). At that time, mental health treatment notes also documented Plaintiff's normal gait. (R. 33, 742).

Mental health treatment notes likewise consistently noted Plaintiff's normal gait throughout 2016. (R. 33, 743-44, 828-30). In February 2016, Plaintiff reported that her balance was still off but improved (R. 736), and Dr. Purath stated that she looked and sounded "wonderful[.]" (R. 34, 736). When Plaintiff saw Dr. David in April 2016, a neurologic exam revealed normal gait, strength, sensation, and cranial nerve findings. (R. 33, 826). In June 2016, Plaintiff reported doing well overall; and Dr. Purath described her as off-balance when she walked, but noted no use of a cane, intact cranial nerves, and symmetric strength. (R. 33, 753). In September 2016, Dr. Purath observed that Plaintiff had a non-ataxic gait despite complaining of dizziness. (R. 33, 755). In December 2016, Plaintiff told Dr. Purath that she had balance issues at times. (R. 757).

In December 2016, Plaintiff complained to Dr. Koganti of mild right-sided weakness. (R. 33, 765-66). Dr. Koganti noted that Plaintiff had trace leg and ankle edema, and strength of 4/5 on the right side of the body as compared to 5/5 on the left; but she was in no distress, displayed equal reflexes, and had no cranial nerve or sensory deficits. (R. 33, 766-68). Plaintiff also reported walking 4,000 steps per day. (R. 33-34, 766). Plaintiff complained of dizziness in December 2016 when she began treating with Dr. Koganti (R. 765-66, 768-69), but not in 2017 after a physician treated her with an Epley maneuver (exercise to relieve dizziness). (R. 33, 769, 772).

On one occasion in July 2017, Plaintiff complained to Dr. Koganti of left knee pain and mentioned prior left knee surgeries in 2010 and 2014 (both before the August 19, 2015 alleged onset date). (R. 28, 771-74). At that time, Dr. Koganti observed decreased range of motion, swelling, and effusion of the left knee. (R. 28, 773). However, in August 2017, Dr. Koganti noted normal musculoskeletal range of motion with no edema. (R. 33, 774). Mental health treatment notes in August 2017 also documented Plaintiff's normal gait, station, and muscle strength. (R. 33, 843).

Based on the foregoing evidence, the ALJ determined that Plaintiff retained the RFC to perform the standing and walking required of light work. (R. 31, 34). The ALJ acknowledged Plaintiff's claims that she: could walk about five minutes at a time; regularly used a cane, particularly when walking; experienced dizziness when standing and could stand for no more than five minutes at a time; and had difficulty balancing. (R. 32, 33). But the ALJ found that the record did not support Plaintiff's claimed degree of limitation given the: absence of medical evidence of consistent gait problems; medical evidence of generally normal gait, extremity motion, strength, and cranial nerve findings; lack of

consistent reports of, or regular treatment for, right-sided weakness; lack of regular use of, or prescription for, a cane; lack of physical therapy; continued ability to work out with a personal trainer; ability to walk 4,000 steps per day; absence of consistent clinical signs of dizziness; and control of dizziness with an Epley maneuver. (R. 28, 29, 33-34). Plaintiff fails to address any of this evidence, nor does she explain how (if at all) it supports her claims of disabling symptoms.

Moreover, the ALJ accorded "significant weight" to the opinions of state agency reviewing physicians Pat Chan, M.D. on November 6, 2015 and Stephanie Green, M.D. on May 25, 2016 that Plaintiff can perform a limited range of light work. (R. 36, 120-122, 139-41). Notably, Plaintiff does not challenge the ALJ's evaluation of these opinions. The ALJ also imposed "more non-exertional limitations than set forth by either" doctor based on Plaintiff's claimed degree of limitation and obesity. (R. 36). In particular, the ALJ imposed greater postural limitations than either doctor assessed (R. 121, 140), including restricting Plaintiff to occasionally balancing, stooping, kneeling, crouching, and crawling. (R. 31). Plaintiff does not object to these limitations.

Finally, as for Plaintiff's asserted need for "rest breaks for fatigue[,]" she relies on: her statement when evaluated for speech therapy in September 2014 (before the August 19, 2015 alleged onset date) about feeling tired and needing to nap more often; and Dr. Purath's treatment note in September 2016 indicating that "it is important for her to rest when she can." (Doc. 18, at 11, citing R. 488, 755). The ALJ considered these treatment records, albeit without mentioning these specific statements (R. 33-35, 496, 517, 755), and acknowledged Plaintiff's claimed fatigue. (R. 32, 35-36). Of course, the ALJ need not "'provide a complete written evaluation of every piece of" evidence, *Pepper*, 712 F.3d

at 362, particularly that which does not demonstrate a greater degree of functional limitation than the ALJ found. Here, Plaintiff cites no evidence that supports a need for more breaks than would be allowed during a normal workday.

For all of these reasons, the ALJ's physical RFC determination is supported by substantial evidence, and Plaintiff's request to remand the case for further consideration of this issue is denied.

### C. Treating Physician Opinion

Plaintiff also objects that the ALJ failed to address Dr. Purath's treatment records from October 2014 to May 2015 limiting her to working part-time as a case manager for the VA prior to the August 19, 2015 alleged onset date. (Doc. 18, at 10-11; Doc. 28, at 2). Following the CVA in August 2014, Dr. Purath initially released Plaintiff to work four hours per day four days per week in October 2014; and incrementally increased Plaintiff's work schedule until March 2015, when it was "apparent" she was struggling more with speech due to anxiety and stress. (R. 706, 709, 711, 712, 714). By April 2015, Dr. Purath allowed Plaintiff to work six hours per day five days per week. (R. 716). But, in May 2015, Plaintiff reported fatigue and trouble focusing, and Dr. Purath restricted her work schedule to five hours per day. (R. 718, 721).

Plaintiff is correct that the ALJ did not discuss these records. However, the ALJ acknowledged that Plaintiff returned to her past skilled work on a part-time basis after the CVA. (R. 34, 83-85). And, based on the VE's testimony, the ALJ concluded that Plaintiff could not perform this past work. (R. 37, 97-100). This finding is entirely consistent with the statements made in Dr. Purath's treatment records restricting Plaintiff to working part-time before the August 19, 2015 alleged onset date. In her reply brief, Plaintiff now argues

that—based on these pre-alleged onset treatment records—Dr. Purath's post-alleged onset opinion that she could not perform her past, or any other, work "warranted controlling, or at least significant, weight[.]"   (Doc. 28, at 2-4).   Plaintiff waived this argument by raising it for the first time in the reply brief.   *Davis v. Colvin*, No. 13 C 5204, 2016 WL 278859, at *10 (N.D. Ill. Jan. 22, 2016) (citing *Frey v. E.P.A.*, 751 F.3d 461, 466 n.2 (7th Cir. 2014)).

Setting aside the issue of waiver, a treating source opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.   20 C.F.R. § 404.1527(c)(2); *see Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010).   If the opinion is contradicted by other evidence or is internally inconsistent, the ALJ may discount it so long as he provides an adequate explanation for doing so.   *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).   That is to say, the ALJ must offer "good reasons" for discounting a treating physician's opinion, *Scott*, 647 F.3d at 739, and then determine what weight to give it considering (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, (5) whether the opinion was from a specialist, and (6) other factors brought to the attention of the ALJ.   20 C.F.R. § 404.1527(c)(2)-(6); see *Simila*, 573 F.3d at 515.

In determining that Plaintiff retains the RFC to perform a limited range of light work, the ALJ gave "[l]ittle weight" to the opinion evidence of Dr. Purath.  (R. 36).  In a letter dated October 26, 2015, Dr. Purath stated that: the functions of Plaintiff's "position as a social worker involve[d] being able to focus for long periods of time, deal[ing] with veterans with numerous concerns, and implementing and evaluating the interdisciplinary treatment plans" and may have required her "to travel or participate in research[;]" and she could not perform these duties "for the foreseeable future." (R. 777).  Overall, Dr. Purath opined that Plaintiff "suffered residual neurological deficits" from her August 2014 stroke that made it "impossible" for her to continue working "as a social worker/case manager."  (R. 36, 777).  In treatment notes from 2015 to 2017, Dr. Purath additionally wrote that Plaintiff could not perform any job.  (R. 33, 36, 732-33, 753-54, 785-86).

The legal question of whether a claimant qualifies for benefits is reserved to the Commissioner, however, the ALJ "must consider a treating physician's view that the severity of a claimant's impairments makes her unable to work" when making the RFC determination.  *Knapp v. Berryhill*, 741 Fed. Appx. 324, 327 (7th Cir. 2018) (citations omitted).  Here, the ALJ considered Dr. Purath's opinion that Plaintiff could not work.  (R. 36).  Still, the ALJ criticized Dr. Purath's statements for being "conclusory and vague" and providing no "narrative explanation of" Plaintiff's functional limitations in "vocationally relevant terms."  (*Id.*).  The ALJ also found Dr. Purath's conclusions inconsistent with the record evidence of Plaintiff's functional abilities, particularly: findings of normal gait, fluent speech, intact memory, and fair to normal concentration/attention; no speech therapy since 2014; no physical therapy; and activities of daily living, including driving, performing

household chores, and living alone. (*Id.*). For these reasons, the ALJ discounted Dr. Purath's opinion. Notably, Plaintiff does not challenge these reasons.

Instead, Plaintiff asserts that Dr. Purath's opinion is consistent with a "neurophysiological evaluation" performed in 2018. (Doc. 28, at 5; *see also* Doc. 18, at 3-4). This evidence was submitted to the Appeals Council, but not the ALJ. (R. 1-5, 10-21, 432-33). Absent any argument that the Appeals Council erred in refusing to consider this evidence, the Court cannot consider it. *See Farrell v. Astrue*, 692 F.3d 767, 770-71 (7th Cir. 2012) ("Evidence that has been rejected by the Appeals Council cannot be considered to reevaluate the ALJ's factual findings.").

Finally, Plaintiff suggests that the ALJ did not properly evaluate the factors in weighing Dr. Purath's opinion. (*See* Doc. 28, at 4). After declining to afford the treating physician's opinion controlling weight, the ALJ was required to address what weight the opinion merited considering the regulatory factors. *See* SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996) (treating source opinions "are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527"). On the record in this case, the ALJ "sufficiently accounted for the factors" by considering Dr. Purath's treatment notes in September 2014 (immediately after the CVA) and from 2015 to 2017 (after the alleged onset date) and addressing the inconsistency of her opinion that Plaintiff could not work with the record as a whole. (R. 32, 33-36, 704-05, 732, 735-36, 753, 755, 785-86). *Schreiber v. Colvin*, 519 Fed. Appx. 951, 959 (7th Cir. 2013) (while the ALJ "did not explicitly weigh each factor in discussing" the treating physician's opinion, the decision made clear that "he was aware of and considered many of the factors, including" treatment relationship, consistency with the record as a whole, and supportability).

Viewing the record as a whole, the ALJ did not err in evaluating the treatment records of Dr. Purath and according her opinion little weight in determining that Plaintiff retains the RFC to perform a limited range of light work.

### D. Subjective Symptom Assessment

Plaintiff finally challenges the ALJ's assessment of her subjective symptom allegations. (Doc. 18, at 12-14; Doc. 28, at 6-7). The regulations describe a two-step process for evaluating a claimant's own description of her impairments. SSR 16-3p, 2017 WL 5180304, at *2 (Oct. 25, 2017). First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." *Id.* at *3. Second, if there is such an impairment, the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities . . . ." *Id.* In evaluating a claimant's symptoms, "an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations . . . and justify the finding with specific reasons." *Villano*, 556 F.3d at 562.

The Court gives the ALJ's assessment of a claimant's subjective symptom allegations "special deference and will overturn it only if it is patently wrong." *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019); *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017) (internal quotations omitted). A reviewing court should rarely disturb a subjective symptom assessment, as it lacks "the opportunity to observe the claimant testifying." *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006). The claimant bears the

burden of showing that an ALJ's subjective symptom evaluation is patently wrong. *See Horr v. Berryhill*, 743 Fed. Appx. 16, 20 (7th Cir. 2018).

As the ALJ explained, following a CVA in August 2014, Plaintiff returned to her past skilled work as a case manager for the VA on a part-time basis prior to the August 19, 2015 alleged onset date. (R. 34, 83-85). The ALJ acknowledged that Plaintiff alleged physical dysfunction post-CVA, claiming that she: could walk about five minutes at a time; regularly used a cane, particularly when walking; experienced dizziness when standing and could stand for no more than five minutes at a time; and had difficulty balancing and bending. (R. 32, 66-68, 81-82). The ALJ also acknowledged that Plaintiff alleged mental problems post-CVA, including: difficulty focusing and thinking; word-finding issues and impaired memory; anxiety and panic around other people; cognitive dysfunction and the need for help from her sister paying her bills; trouble with reading comprehension and the need for help going through her mail; episodes of confusion that required her to reorient herself; and fatigue with the need to rest/sleep during the day. (R. 32, 63-66, 78-80). The ALJ also considered the testimony of Plaintiff's sister as to "similar issues[,]" namely: difficulty standing; often lying down; trouble dealing with crowds and talking to people; and problems getting easily distracted and not concentrating well. (32, 87-89, 91-92).

With regard to physical limitations, Plaintiff argues that, in discounting her statements about difficulty walking and standing, the ALJ improperly considered her report to Dr. Koganti in December 2016 that she walked 4,000 steps per day. (Doc. 18, at 13; Doc. 28, at 6). Contrary to Plaintiff's suggestion (Doc. 18, at 13), the ALJ addressed abnormal clinical findings made at that time, including right-sided weakness and trace edema. (R. 33, 766-68). And, as noted, the ALJ reasonably relied not only on the report

of walking 4,000 steps per day but also other medical evidence documenting: absence of consistent gait problems; generally normal gait, extremity motion, strength, and cranial nerve findings; lack of consistent reports of, or regular treatment for, right-sided weakness; lack of regular use of, or prescription for, a cane; lack of physical therapy; continued ability to work out with a personal trainer; absence of consistent clinical signs of dizziness; and control of dizziness with an Epley maneuver.  (R. 28, 29, 33-34).  The ALJ also addressed Plaintiff's activities of daily living, including: performing household chores such as sweeping, washing dishes, doing laundry, and vacuuming; independently caring for her hygiene; caring for her dogs; and playing with her grandson.  (R. 30-31, 35, 75-78).  The ALJ specifically noted that climbing stairs to do laundry did not suggest debilitating gait/balance issues.  (R. 30, 35).  Plaintiff does not challenge these additional bases for the ALJ's assessment of her physical symptoms.

As for mental limitations, Plaintiff contends that, in discounting her statements about trouble concentrating, the ALJ improperly considered her ability to watch television. (Doc. 18, at 13; Doc. 28, at 6).  To the contrary, the ALJ found that Plaintiff's ability to watch television and engage in a number of other activities of daily living did not support the claimed degree of difficulty concentrating or disabling mental limitations.  (R. 35-36). The ALJ relied on Plaintiff's ability to: be a good historian at the hearing; live alone; drive; watch television; count change; use a checkbook; use a cell phone, including an app to help manage diet; talk to neighbors; see friends; attend church; have lunch with friends; care for her dogs; and play with her grandson.  (R. 30-31, 35, 75-78).  The ALJ also specifically found that: driving and watching television indicated an ability to concentrate; completing function reports, driving, using a checkbook, and counting change were

incompatible with disabling cognitive limitations; seeing friends, attending church, and having lunch with friends indicated Plaintiff could be around others; and sleeping eight hours per night undermined allegations of fatigue. (R. 30, 35-36). The ALJ also noted that Plaintiff's sister visited only a few times per month, contrary to the claimed need for her help. (R. 32, 35, 87). Plaintiff does not dispute these additional findings that support the ALJ's assessment of her mental symptoms.

Finally, Plaintiff asserts that she was "entitled to a finding of substantial credibility" based on her "strong work history" as a case manager for the VA. (Doc. 18, at 14). As the Commissioner notes (Doc. 27, at 13), the ALJ's failure to discuss Plaintiff's work history when assessing her subjective symptoms does not constitute reversible error. *See Summers*, 864 F.3d at 528-29 (explaining that consistent work history weighs in favor of a "positive credibility finding," but is one of many factors and not dispositive); *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016) (concluding that ALJ's silence as to work history was "not enough to negate the substantial evidence supporting the adverse credibility finding"). To the extent Plaintiff adds in her reply brief that the ALJ failed to consider her efforts to continue working after the CVA (Doc. 28, at 5), the record belies this since the ALJ noted that Plaintiff returned to her past skilled work on a part-time basis. (R. 34, 83-85).

An ALJ's credibility assessment "need not be perfect; it just can't be patently wrong." *Dawson v. Colvin*, No. 11 C 6671, 2014 WL 1392974, at *10 (N.D. Ill. Apr. 10, 2014) (citing *Schreiber*, 519 Fed. Appx. at 961). And "[a]s the Supreme Court observed fairly recently, substantial evidence is not a high standard, and requires only evidence that 'a reasonable mind might accept as adequate.'" *Richard C. v. Saul*, No. 19 C 50013,

2020 WL 1139244, at *5 (N.D. Ill. Mar. 9, 2020) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)).   Here, the ALJ provided several valid reasons for discounting Plaintiff's complaints of disabling symptoms, and substantial evidence supports that decision.

### <u>CONCLUSION</u>

For the reasons stated above, Plaintiff's motion for summary judgment (Doc. 17) is denied, and the Commissioner's motion for summary judgment (Doc. 27) is granted. The Clerk is directed to enter judgment in favor of the Commissioner.

ENTER:

Dated: November 12, 2021

SHEILA FINNEGAN
United States Magistrate Judge